## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **SMARTSKY NETWORKS, LLC,** | **Case No. 1:22-cv-00266-JDW** |
| *Plaintiff,* | |
| v. | |
| **GOGO BUSINESS AVIATION LLC and GOGO INC.,** | |
| *Defendants.* | |

## MEMORANDUM

A patent damages analysis is like a walk through the multiverse, trying to reconstruct worlds other than the Earth 616 that we all inhabit. Because those alternate worlds don't exist (at least as far as we know), that reconstruction involves some degree of guesswork. But that's not a license for experts to abandon their obligation to conduct meaningful analysis when reconstructing a hypothetical universe. They can't just take their clients' word for what the alternate world would have been like, nor can they assume away problems with their reconstructed world.

SmartSky Networks LLC offers expert testimony from two witnesses to prove its damages in this case, Ryan Stone (its President) and Bryce Cook (a specially retained expert), but there are problems that preclude either from testifying. SmartSky didn't disclose that Mr. Stone would be an expert in the case. Now, with trial a month away, it's too late to fix that mistake. As for Mr. Cook, his analysis of SmartSky's lost profits simply

parrots Mr. Stone, doesn't account for alternative products in the market, and doesn't reckon with regulatory requirements that might have limited SmartSky's ability to make sales in the hypothetical world. Also Mr. Cook's reasonable royalty analysis relies on a real-world contract that is not sufficiently comparable to the one that would have been negotiated in the hypothetical world he is attempting to reconstruct. It also fails to account for the value of the unpatented features that contributed to the network that Gogo Business Aviation LLC and Gogo Inc. (together, "Gogo") built. I will therefore grant Gogo's motions to preclude the expert opinions of Mr. Stone and Mr. Cook. Because that will leave SmartSky without proof to support its claim for lost profits, I will also grant summary judgment of no lost profits.

## I.    BACKGROUND

### A.    The Technology At Issue

SmartSky asserts that Gogo infringed six of its patents that enable in-flight Wi-Fi via a 5G cellular network using air-to-ground ("ATG") communications. Among other things, the patents disclose inventions that ensure continuous ATG communication that should reduce buffering and dropped signals during air travel. When it filed this case, SmartSky had begun the process of building out its own 5G ATG network to market to air carriers.

Like SmartSky, Gogo has been building a 5G ATG network to provide in-flight aircraft with access to high-speed internet. Gogo's network consists of 150 base stations

and two different radios that use licensed and unlicensed spectrum to communicate with those base stations. Gogo's 5G ATG network is not operational, but Gogo has provided its customers with special antennas that have the capability of connecting with both Gogo's currently operational 4G network and Gogo's forthcoming 5G network. In the course of this case, Gogo has also posited a way to work around SmartSky's patents by using a 5G network that periodically reverts back to the 4G network to facilitate handoffs from one base station to another.

### B.    The Disputed Damages Testimony

At trial, to support its claims for damages, SmartSky intends to offer testimony from Mr. Stone and Mr. Cook. SmartSky seeks to have Mr. Stone testify to, among other things, hearing from actual and potential customers about problems with Gogo's 4G ATG internet service to inform his opinion "that customers might not find such inconveniences to be an acceptable result." (D.I. 395 at 16.) Mr. Stone apparently told Mr. Cook that "an interruption in the higher-speed connection that required reverting ... back to the Gogo 4G connection would not be commercially acceptable to users." (D.I. 366-1 at 133.)

Mr. Cook, in turn, will opine that if SmartSky proves that Gogo infringed its patents, then SmartSky is entitled to lost profits of $161,069,637 or reasonable royalty damages of $10,976,000. For his lost-profits calculation, Mr. Cook applied the four-factor test from *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978) and determined that (1) there was demand for SmartSky's patented technology, (2) there were

3

no acceptable non-infringing alternatives, (3) SmartSky had the capacity to exploit the demand for its patented technology, and (4) SmartSky would have made $161,069,637 if Gogo had not infringed its patents.

For his reasonable royalty calculation, Mr. Cook based his analysis on a contract that he deemed comparable to a hypothetical patent license agreement between Gogo and SmartSky. The contract was the $400 million purchase and sale agreement that Gogo entered into with Intelsat Jackson Holdings S.A. ("Intelsat"), which covered the sale of Gogo's commercial aviation business. Mr. Cook used only a portion of that contract—a four-page Network Services Agreement that is one exhibit to the 372-page business-sale agreement. The Network Services Agreement concerned Gogo's promise to provide Intelsat with access to both its currently active 4G network and forthcoming 5G network.

As part of that deal, Intelsat agreed to pay Gogo a certain percentage of its revenues for access to Gogo's 4G network and a higher percentage of its revenues for access to Gogo's forthcoming 5G network. Recognizing that he was using an agreement that did not license any intellectual property as a comparator for a hypothetical patent license, Mr. Cook explained that the Intelsat agreement served as a sufficient comparator because it—like a patent license—ends with "the same business outcome," meaning "freedom to operate" on a network. (D.I. 366-1 at 25, ¶ 82.) After using Intelsat's rate for 5G-network access as a starting point, Mr. Cook made some adjustments based on other

4

factors to determine that SmartSky would be entitled to a 25% reasonable royalty rate if it had entered into a patent licensing agreement with Gogo right before Gogo infringed.

### C.    Procedural History

SmartSky filed this suit on February 28, 2022. It amended its Complaint on February 21, 2023. Gogo asserts counterclaims, including invalidity and non-infringement. Judge Jennifer L. Hall issued a claim construction decision on March 25, 2024. Both Parties moved for summary judgment. I ruled on all of the summary judgment motions except one on August 7, 2025. The remaining summary judgment motion was Gogo's motion for summary judgment of no lost profits. At the same time that Gogo moved for summary judgment, it moved to exclude expert testimony from Mr. Cook and Mr. Stone.

On August 8, 2025, I ruled that Mr. Stone's proposed testimony was expert testimony and that SmartSky failed to disclose it. I ordered the Parties to submit supplemental briefing concerning what remedy would be appropriate in light of governing Third Circuit law as reflected in *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894 (3d Cir. 1977) ("*Pennypack*"). I then had a hearing to address the motions concerning Mr. Stone's and Mr. Cook's proposed testimony. Trial is set to begin on November 17, 2025.

## II.     LEGAL STANDARD

### A.     *Pennypack*

Before a court can exclude expert testimony as a sanction for violating disclosure requirements, the Third Circuit requires it to consider five factors: (1) the prejudice or surprise of the party against whom the excluded witness would have testified; (2) the ability of the party to cure the prejudice; (3) the extent to which allowing such evidence would disrupt the orderly and efficient trial of a case; (4) any bad faith or willfulness in failing to comply with the court's scheduling order; and (5) the importance of the excluded testimony. *See Pennypack*, 559 F.2d at 904–06, *overruled on other grounds as recognized by Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012).

### B.     *Daubert*

Regional circuit law applies to issues concerning the admissibility of expert opinions unless those issues are unique to patent law, but they apply Federal Circuit law when determining the amount of damages to which a plaintiff is entitled because that inquiry involves issues unique to patent law. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390–91 (Fed. Cir. 2003); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995). "Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law," so Third Circuit law applies. *Id.* And under Third Circuit law, the Federal Rules of Evidence "govern[] the admissibility of expert testimony."

*Kannankeril v. Terminix Int'l., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert" may testify if the expert's testimony "will help the trier of fact to understand the evidence or determine a fact in issue," "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. In other words, for an expert's testimony to be admissible, it must be reliable. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000). "Subjective belief or unsupported speculation" is not enough; the expert must have "good grounds" for his or her expert opinions. *Id.* (internal quotation marks omitted).

### C.    Summary Judgment

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). In opposing summary judgment, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings" and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quotation omitted).

7

"[I]nstead, he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). If he fails to make this showing, then the Court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

## III.    ANALYSIS

25 U.S.C. § 284 guarantees a patent holder damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty." Upon a showing of infringement, SmartSky may be entitled to lost profits or reasonable royalties. *See Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017).

### A.    Lost Profits

To recover lost profits in a patent infringement case, a patentee must demonstrate that there was a reasonable probability that "but for" the infringement, the patentee would have made the infringer's sales. *Rite-Hite*, 56 F.3d at 1545. To determine whether the patentee has successfully shown but-for causation, courts use the test in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), which requires the patentee to establish: (1) demand for the patented product, (2) absence of acceptable non-infringing alternatives, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of profit the patentee would have made. *See id.*; *Shire Viropharma*

8

*Inc. v. CSL Behring LLC*, No. 17-414, 2021 WL 1227097, at *24 (D. Del. Mar. 31, 2021). "Damages under *Panduit* are not easy to prove." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017). Because Mr. Cook relies to some degree on Mr. Stone's proposed testimony for his analysis of the *Panduit* factors, I will first address Gogo's motion to exclude Mr. Stone's testimony and then turn to its motion to exclude Mr. Cook.[1]

### 1.    Mr. Stone

Because I have determined that Mr. Stone's proposed testimony about how consumers would have reacted to Gogo's potential product offerings constitutes expert testimony and that SmartSky failed to disclose it. I therefore have to decide whether the *Pennypack* factors favor excluding his testimony.

The first three *Pennypack* factors favor exclusion. SmartSky's failure to disclose Mr. Stone as an expert creates a risk of unfair prejudice to Gogo. Gogo probed SmartSky's experts to understand which of them would opine on whether consumers would find any of Gogo's proposed non-infringing alternatives to be acceptable, and each of SmartSky's experts disclaimed any intent to offer such an opinion. Gogo planned its case strategy accordingly, mustering evidence and determining the subjects on which it would have its own experts opine. Had SmartSky disclosed Mr. Stone as an expert in the first instance,

---

[1] The Parties agree that if I exclude Mr. Cook's lost profits analysis, then I should grant Gogo summary judgment of no lost profits, but if I permit Mr. Cook's testimony, then I should deny summary judgment.

Gogo could have conducted itself differently. Now, with trial less than a month away, Gogo would hardly have the same opportunity to prepare for trial and develop an appropriate record. The loss of such an opportunity is the very sort of prejudice that the disclosure rules are supposed to prevent.

In its supplemental brief, SmartSky argues that Gogo has not suffered prejudice because SmartSky disclosed that Mr. Stone would testify about commercially acceptable alternatives during discovery. I disagree. SmartSky designated Mr. Stone to testify about the "availability" of commercially non-infringing alternatives, not their "acceptability." (D.I. 508-2 at 31 (Topic 47).) Acceptability, however, is a technical topic, not one simply based on personal observations about what existed in the market. In addition, Mr. Stone submitted a declaration in 2022, in which he opined about whether satellite service was an alternative to ATG networks, but that declaration says nothing to put Gogo on notice that Mr. Stone would offer opinions about consumer preferences or responses to Gogo's proposed non-infringing alternatives. Thus, in context, SmartSky's designation that Mr. Stone would testify about the availability of commercially non-infringing alternatives did not put Gogo on notice that he would testify about the technical topic of whether consumers would find such alternatives acceptable.

In addition to the prejudice that Gogo would suffer, the timing of SmartSky's belated disclosure makes any attempt at curing the prejudice difficult and would disrupt an orderly and efficient trial (the second and third *Pennypack* factors). Trial is scheduled

to begin in less than one month. Although SmartSky suggests that a cure would just require a short deposition of Mr. Stone, that suggestion undersells all that it would take to cure the prejudice. Gogo would need to depose Mr. Stone and then have its experts review and address his testimony. Gogo might even need to hire and prepare a new expert to testify about (and perhaps survey) customer preferences to rebut Mr. Stone. And even if the Parties could get that done before trial (and I have significant doubts about the feasibility of that), it would leave everyone scrambling on the eve of trial to incorporate new information and would inevitably lead to disputes that would distract from trial itself. Faced with similar circumstances, judges in this District have held that these factors favor exclusion. *See, e.g., LoganTree LP v. Fossil Grp., Inc.*, No. 21-385, 2024 WL 5333640, at *2 (D. Del. Dec. 19, 2024); *Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*, No. 15-819, 2017 WL 11558096, at *11 (D. Del. Dec. 11, 2017).

The fourth *Pennypack* factor is neutral. I've seen no evidence that SmartSky acted in bad faith or willfully failed to comply with the Scheduling Order or the Federal Rules. Instead, the disclosures seem to arise from a mistake, at worst. But I can't go so far as to say that this is all a product of good faith and that this factor favors inclusion.

Finally, the last factor is the importance of the evidence, which is often the most critical. True, Mr. Stone's expert testimony does appear to be important to SmartSky's case for lost profits because Mr. Cook relies on it. But its scope limits its importance. For one thing, Mr. Stone's testimony does not bear on SmartSky's claim for a reasonable

royalty. With respect to SmartSky's case for lost profits, Mr. Stone's testimony only bears on one of the *Panduit* factors. And, even as to the second factor, it only addresses consumers' acceptability of Gogo's 4G service, not the workaround that Gogo has posited as an alternative. Thus, while this factor favors inclusion, it does not do so strongly enough to outweigh the three *Pennypack* factors that favor exclusion. I therefore will grant Gogo's motion to exclude Mr. Stone's expert testimony.

### 2.    Mr. Cook

Without Mr. Stone's testimony, Mr. Cook's expert testimony as to lost profits is unreliable. That is because his analysis of the second and third *Panduit* factors absent Mr. Stone's testimony is not sufficient to go before the jury.

### a.    *Panduit* factor two—acceptable, non-infringing alternatives

The second *Panduit* factor "often proves the most difficult obstacle for patent holders." *Mentor Graphics Corp.*, 851 F.3d at 1286. Under that factor, a patentee must show the complete absence of acceptable, non-infringing alternatives to get lost profits for a particular sale. *See id.* "[I]f there is a non[-]infringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." *Id.* The proper inquiry is "whether a non-infringing alternative would be acceptable compared to the patent owner's product, not whether it is a substitute for the infringing product." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1381 (Fed. Cir. 2017). This "inquiry therefore requires reconstruction

of the market, as it would have developed absent the infringing product, to determine what [sales] the patentee would have made." *Id.* (alterations accepted and internal quotation marks omitted).

In this case, Gogo has posited two non-infringing alternatives: (i) a 5G network that would not employ SmartSky's patented handoff features (which might lead to some lags or buffering during handoffs); and (ii) its existing 4G ATG network. To recover lost profits, SmartSky must prove that customers would not have found either option acceptable. But Mr. Cook does not have a basis to opine that customers would have found either alternative unacceptable.

Mr. Cook did not do an independent analysis of consumer preferences. He relied on Mr. Stone for that. He admitted as much during his deposition, when he explained that he did not conduct any analysis of what customers would have deemed acceptable. (*See* D.I. 366-1 at 133.) Courts do not permit expert opinion that is just "unfiltered regurgitation of what other people told him." *ExpertUniverse, Inc. v. Cisco Sys., Inc.*, No. 09-157, 2013 WL 865974, at *3 (D. Del. Mar. 7, 2013); *see also Mfg. Res. Int'l, Inc. v. Civic Smartscapes, LLC*, 17-269, 2019 WL 4198194, at *5 (D. Del. Sept. 4, 2019). These decisions are persuasive to me. SmartSky cannot use Mr. Cook as a backdoor to parrot Mr. Stone's opinion about commercial acceptability to customers without any analysis of his own.

Without Mr. Stone's testimony, Mr. Cook has no real evidence concerning customer acceptance of the non-infringing alternatives. With respect to the proposed

workaround for the 5G network, other than Mr. Stone's opinion, Mr. Cook points only to his argument that if Gogo's $1.5 million hand-off alternative was commercially acceptable Gogo would have implemented it to avoid the higher costs associated with litigation, SmartSky's contention is insufficient. (*See* D.I. 366-1 at 56.)  There's no analysis backing up Mr. Cook's assertion. Mr. Cook does not know how much risk Gogo thinks there is of losing this case. And, while the workaround might not have been "expensive," it still had the potential to cost more than $1.5 million, which Gogo might not have wanted to spend unnecessarily. Also, Gogo might have seen value in having the 5G service that it offered, rather than the workaround solution because the workaround solution, with its periodic 4G handoffs, might have been suboptimal but not so suboptimal that consumers would have rejected it. All of which is to say that Mr. Cook's cursory dismissal of this workaround does not reflect the sort of robust analysis that experts must perform to pass a gatekeeping evaluation under Rule 702.

### b.    *Panduit* **factor three—capability to exploit demand**

To meet the third *Panduit* factor, a patentee must establish that it had the capability to exploit the demand for its patented technology. *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1551 (Fed Cir. 1994). In a two-supplier market, which is what the market for ATG networks appears to be, "it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales." *TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 790 (Fed. Cir. 2019) (quoting *State*

*Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989)). But in reconstructing the market to be one where there was no infringement and then determining which sales SmartSky would have been able to make, it seems reasonable enough to require an expert to account for any regulatory or licensing requirements that would limit a patentee's (or anyone else's) ability to participate in the market, particularly when those requirements impact the patentee's ability to make the sales.

In this case, the market for ATG networks required SmartSky, Gogo, or any other seller to obtain a Supplemental Type Certificate ("STC") from the FAA, which allowed for modification of an airframe to add the required communications gear. Regulatory approval comes airframe by airframe. That is, the FAA might issue an STC to approve a seller (or a company with which it contracts, such as an aircraft maintenance company) to modify one type of airframe, like a Gulfstream G7, but it would require a different STC for a different airframe, like a Gulfstream G5. SmartSky estimates that there were 45-50 different types of airframes in the relevant market. It had approval for 11, with another 6 or 7 at some stage of the process.

Mr. Cook assumes that SmartSky had the ability to make all of Gogo's sales, but he has done no analysis to determine whether the FAA's licensing requirements would have prevented that. Mr. Cook did not analyze the types of airframes for which SmartSky had STCs or for which Gogo made infringing sales. He therefore does not offer any opinion on whether any particular sale was for a type of aircraft for which SmartSky had an STC.

15

As a result, he has not demonstrated that SmartSky had the capacity to make a particular sale.

Mr. Cook attempted to avoid this hurdle by assuming that SmartSky would have had the regulatory approvals that it needed if Gogo had not interfered with its ability to raise capital. But his assumption is flawed in two significant respects. *First*, rather than do any analysis, Mr. Cook just relied on and parroted Mr. Stone's testimony[2] to conclude that SmartSky would have obtained the required STCs. Indeed, at his deposition Mr. Cook conceded that he was not offering an opinion as to the "adequacy of the STCs that SmartSky would have had in the but-for world." (D.I. 366-1 at 138.) He made a similar concession in his Reply Report. Instead, he relied on Mr. Stone to offer that testimony. That "unfiltered regurgitation of what other people told him" is not expert analysis that satisfies Rule 702. *XpertUniverse, Inc.*, 2013 WL 865974, at *3.

Importantly, Mr. Cook could have performed some meaningful analysis to evaluate Mr. Stone's testimony. For example, he could have reconstructed the market to determine what sales SmartSky would have made at any given time, determined what cash flow that would have generated, and then analyzed how SmartSky might have used the free cash that those sales generated to obtain additional STCs for particular aircraft. By performing

---

[2] During argument, SmartSky claimed that Mr. Cook also relied on SmartSky's CEO. Noticeably, however, Mr. Cook doesn't cite that testimony in either of his expert reports. And even if he had, it wouldn't matter because he can't regurgitate testimony from two internal witnesses any more than he can rely on one.

that analysis, Mr. Cook might have been able to figure out which sales SmartSky would have made and when it would have made them. But he made no effort to do that analysis. When asked whether he knew the content of Mr. Stone's forthcoming testimony with respect to SmartSky's "marketing and sales capacities," Mr. Cook confirmed that he only knew what it would be at a "high level," meaning that SmartSky "had the capacity ... [and] the relationships." (D.I. 366-1 at 139.) In effect, Mr. Cook just accepted Mr. Stone's assertion that SmartSky would have had the STCs to make all of the sales. That blind reliance, without any analysis of his own, is not what Rule 702 requires.

And to the extent that SmartSky and Mr. Cook argue that SmartSky could have used a different regulatory procedure to avoid the STC requirement, they provide no support for such argument. Neither Mr. Cook nor any other expert analyzed the possibility that SmartSky could or would use that alternative regulatory procedure. To rely on that possibility, Mr. Cook would have had to do some analysis, particularly because SmartSky itself had never relied on that procedure. His failure to do so renders his reliance on that regulatory alternative an unreliable assumption, not an admissible expert opinion.

### 3.    Summary judgment

In opposing summary judgment of no lost profits, SmartSky argues that "[b]ecause Gogo's argument to exclude [Messrs. Stone and Cook] are misplaced, SmartSky has demonstrated a dispute of material fact that requires a trial on the issue." (D.I. 397 at 24-25.) It then goes on to rely on Mr. Cook and Mr. Stone to suggest that there are factual

disputes about the *Panduit* factors. My decision to exclude Mr. Stone's and Mr. Cook's opinions leaves SmartSky without the evidence that it concedes that it needs to support its lost profits claim, so I will grant summary judgment on the issue.

### B. Reasonable Royalty

A reasonable royalty is typically "based upon a hypothetical negotiation between the patentee and the infringer when the infringement began." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). One common method for determining reasonable royalties is called the "'willing licensor-willing licensee' approach," which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Of course, any reasonable royalty analysis "necessarily involves an element of approximation and uncertainty." *Id.* at 1325 (internal quotation marks omitted). Nonetheless, "given the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts [are required to] be proactive to ensure that the testimony presented—using whatever methodology— is sufficiently reliable to support a damages award." *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).

Although Mr. Cook bases his reasonable royalty analysis on a real-world contract, the Network Sharing Agreement between Intelsat and Gogo, his use of that contract suffers from two flaws. First, the agreement is not sufficiently comparable to form the

basis of a hypothetical license agreement. Second, Mr. Cook fails to apportion the rate from the Network Sharing Agreement to account for the many other features (both patented and unpatented) that comprised Gogo's 5G network.

### 1.    Comparability

"[P]arties frequently rely on comparable license agreements" to demonstrate what a reasonable royalty should be. *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372 (Fed. Cir. 2020). "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Id.* at 1372–73. However, when relying on actual licenses to prove a reasonable royalty, the license being used "must be sufficiently comparable to the hypothetical license at issue in the suit." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (alterations accepted and internal quotation marks omitted). The actual license need not be perfectly analogous to the hypothetical license. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). But "[l]oose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). That is, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

On these facts, no basis exists for Mr. Cook to rely on the Network Services Agreement between Gogo and Intelsat, for at least three reasons. *First*, the Network Services Agreement does not license any intellectual property. In fact, it provides that "[n]othing in this Agreement shall be construed as granting either Party any right, title or interest in or to any intellectual property rights owned or controlled by the other Party." (D.I. 366-1 at 440.) Other district courts have found distinctions of this sort to be enough to exclude expert testimony. *See, e.g.*, *Probatter Sports, LLC v. Sports Tutor, Inc.*, 586 F. Supp.3d 80, 93–95 (D. Conn. 2022), *aff'd*, No. 2022-1814, 2023 WL 7548208 (Fed. Cir. Nov. 14, 2023). I agree There's a significant conceptual difference between paying to access a fully built network and licensing part of the technology that makes that network run. That difference renders the Network Services Agreement meaningfully different from the hypothetical license agreement that Mr. Cook posits.

Mr. Cook's attempt to bridge the gap between the licenses comes up short. Without any analysis, he waves away the distinction between the Network Services Agreement and his hypothetical license agreement by suggesting that the net result was the same. That's not only too cursory; it's also factually wrong. Intelsat was not contracting for a license to Gogo's allegedly infringing patents. It was contracting for access to Gogo's infringing network. But an agreement that secures access to the allegedly infringing network does not accomplish the same thing as an agreement to license some patents that make the network run. Because Mr. Cook fails to reconcile these differences, the

Network Services Agreement between Intelsat and Gogo is not comparable to a hypothetical patent license between Gogo and SmartSky.

*Second*, the Network Services Agreement is not a stand-alone agreement. It is an attachment to a much larger corporate transaction between Intelsat and Gogo. In any negotiation, there's give and take, even for unrelated terms of a deal. That is, Intelsat might have made a concession on the rate that it paid for access to Gogo's network in order to secure a concession from Gogo on some other part of the deal. The inverse could also be true. That give-and-take would not have been part of the hypothetical negotiation between SmartSky and Gogo, though. To ensure that the rates that he took from the Network Services Agreement were comparable, Mr. Cook needed to analyze the impact that the other terms of that deal had on the terms of the Network Services Agreement or, at least, determine that they had no impact. But he didn't do so. He just assumed that they were comparable. That's not good enough given the different negotiating situations.

*Third*, and finally, the Parties negotiating the Network Services Agreement were in different bargaining positions. In a hypothetical negotiation, Gogo—an established business with active accounts—would have been negotiating with SmartSky—a struggling start-up. But Gogo's Network Services Agreement with Intelsat was the product of a negotiation between two large, established companies. Like the distinctions in the types of contracts, courts have found that differences in the economic positions of negotiating parties are adequate grounds on which to exclude expert testimony. *See Sprint Commc'ns*

*Co. L.P. v. Comcast IP Holdings*, LLC, No. 12-1013, 2015 WL 456154, at *2 (D. Del. Jan. 30, 2015). Again, Mr. Cook makes no effort to account for, or even acknowledge, these different bargaining positions. Without any such analysis, his determination that the Network Services Agreement is comparable to a hypothetical license agreement between SmartSky and Gogo is not reliable.

Each of these failures, on its own, is enough for me to conclude that the Network Services Agreement is not sufficiently comparable to a hypothetical license to permit Mr. Cook to rely on it. Taken together, these distinctions make the case for exclusion even stronger.

### 2.    Apportionment

The Federal Circuit requires that "to be admissible, all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features," a process known as "apportionment." *Commonwealth Sci. & Indus. Rsch. Organisation*, 809 F.3d at 1301. Apportionment requires that "a patentee must take care to seek only those damages attributable to the infringing features." *Virnetx, Inc.*, 767 F.3d at 1326. An expert's failure to properly apportion damages justifies exclusion of that expert's testimony at trial. *See LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68–69 (Fed. Cir. 2012); *see also Uniloc USA, Inc.*, 632 F.3d at 1318.

Mr. Cook's reasonable royalty analysis fails this requirement. Gogo's 5G network included many valuable aspects, not just the patented technology. To provide 5G service,

Gogo must use technology that practices all 5G standard essential patents. *See, e.g., Telefonaktiebolaget LM Ericsson v. Lenovo (United States), Inc.*, 120 F.4th 864, 867 (Fed. Cir. 2024) (discussing how certain patents are essential to complying with 5G standard). Whether Gogo licenses those patents directly or purchases a service from someone else with an upstream license, Gogo is paying directly or indirectly for that patented technology. It also pays for unpatented aspects of its air-to-ground network, including for spectrum that it acquires from the FCC (or that it licenses from someone who acquired it from the FCC).

Mr. Cook does not take any of this into account in his analysis. He bases his analysis on the Network Services Agreement, which provided Intelsat access to Gogo's network. But that network is far more than SmartSky's patents. It includes all of the other patents necessary for 5G; licensed spectrum; and the spent time, capital, and labor necessary to set up the network. In the context of a hypothetical patent license agreement, SmartSky, of course, would not be entitled to a royalty for any of those things because they all fall outside the scope of its patents.

One fact from this case illustrates the value of the network features other than the patented technology. When Gogo and Intelsat agreed to the Network Services Agreement, they agreed on a price for Intelsat to access Gogo's 5G ATG network and a price to access Gogo's 4G ATG network, which does not infringe SmartSky's patents. The price to access the non-infringing network was more than 60% of the price for access to

the allegedly infringing 5G network. That price indicates that Gogo and Intelsat assigned substantial value to features other than those that tread on SmartSky's patents.

SmartSky's defense of Mr. Cook seems to invoke the entire market value rule, which "is a narrow exception" to the rule of apportionment. *LaserDynamics, Inc.*, 694 F.3d at 67. "If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." *Id.* The exception applies only if the patentee shows that "the patented feature drives the demand for [the] entire multi-component product." *Id.* This type of showing requires a "high[] degree of proof." *Id.* at 68. It is not enough to merely show that the patented technology "is viewed as valuable, important, or even essential to" the product. *Id.* Nor is it sufficient to show that the product would not be commercially viable without the patented technology. *See id.*

SmartSky's attempt to meet this high degree of proof falls short. For one thing, Mr. Cook does not appear to invoke the entire market value rule at all. The words do not appear anywhere in his expert report. More importantly, Mr. Cook didn't conduct any analysis related to whether SmartSky's patented technology is what drove demand for Gogo's in-flight connectivity networks. He cites to no market studies or consumer surveys or anything of the like. Given this lack of evidence, I cannot find that SmartSky has met the burden of proof necessary to invoke the entire market value rule. *See id* at 67–69. Therefore, in addition to excluding Mr. Cook's reasonable royalty opinion for using a

contract that is not sufficiently comparable to a hypothetical patent licensing agreement, I will also exclude it for failure to apportion the value of the allegedly infringing features from the value of all other features.

## IV.  CONCLUSION

SmartSky failed to disclose Mr. Stone as an expert, and it's too late for it to do so now. I will therefore grant the motion to preclude Mr. Stone's testimony. Without Mr. Stone's testimony, Mr. Cook has no basis to opine about the availability of acceptable, non-infringing alternatives. Mr. Cook's opinion about SmartSky's capacity to make Gogo's infringing sales ignores regulatory licensing requirements and does little more than parrot Mr. Stone. Mr. Cook therefore cannot opine on lost profits, and I will grant Gogo's motions to exclude his lost profits testimony and for summary judgment of no lost profits. Finally, Mr. Cook's reasonable royalty analysis fails because it relies on a contract that is not comparable and fails to separate the value of the allegedly infringing features from the value of other features. I will therefore grant Gogo's motion to preclude Mr. Cook's reasonable royalty opinion. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

October 21, 2025